## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| INTL FCSTONE FINANCIAL, INC., | |
| Plaintiff, | No. 19-cv-01438 |
| v. | Judge John F. Kness |
| LINDA JACOBSON, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This matter, which the Court previously ordered must be resolved in arbitration before the National Futures Association (NFA) (*see* Dkt. 68)[1], is before the Court on cross-motions from the parties. In short, each side accuses the other of failing to adhere to the Court's June 4, 2019 order compelling arbitration. (Dkt. 152; Dkt. 156.)

Plaintiff's motion, styled as a "Motion to Enforce" the arbitration order, accuses Defendants of flouting that order by initiating NFA arbitrations outside of this judicial district. Plaintiff further requests contractually-mandated sanctions for this and other purported misconduct. (Dkt. 129; Dkt. 175.) For their part, Defendants move to stay the case and argue that Plaintiff's attempt to litigate the venue and sanctions issues in this Court runs counter to the order compelling arbitration. (Dkt. 156.) Defendants argue that the NFA should resolve those issues in the first instance.

---

[1] Docket numbers refer to case 19-cv-01438. A separate order will be entered addressing the related motions in consolidated case 19-cv-01629.

For the reasons that follow: (1) Plaintiff's motion to enforce the Court's June 4, 2019 order is denied[2]; (2) Plaintiff's motion for contractually mandated sanctions is denied; (3) Defendant's motion to stay this case is denied without prejudice; and (4) Defense counsel is admonished but will not be sanctioned for counsel's conduct. Orders consistent with this opinion will be entered separately in the related cases docketed under numbers 19-cv-01629 and 19-cv-07753.

## I.    BACKGROUND

For a matter that belongs in arbitration, this case has a tortured history in federal court. Three separate actions with more than 300 docket entries among them are currently active before this Court. One of the three pending matters originated in the Northern District of Georgia before traveling almost seven hundred miles to Chicago. All three cases have been appealed to the Seventh Circuit and remanded back to the Northern District of Illinois. And each case has multiple motions pending.

The voluminous procedural history masks the more straightforward nature of this litigation. The merits of the parties' claims—which concern Defendants' losses sustained while trading options on Plaintiff's e-trading platform—are not before the Court.[3] Rather, the parties dispute who should resolve those claims. Oddly, all sides agree that those claims should be adjudicated in arbitration. Although the parties disagreed at first as to whether the NFA should serve as their arbitrator, District

---

[2] Plaintiff's second motion to enforce Court's June 4, 2019 order (Dkt. 175) is also denied for the same reasons identified in this opinion.

[3] For a fuller recitation of the facts underlying this dispute, see the Court's order compelling arbitration. (Dkt. 68.)

Judge Joan H. Lefkow, who was then presiding, resolved that issue by compelling the parties to arbitrate before the NFA and to cease all other arbitrations pending before other arbitral bodies. (Dkt. 68) (the "Arbitration Order").

That should have ended this litigation—but it did not. On June 11, 2019, Defendants appealed that non-final Arbitration Order. (Dkt. 69.) During the pendency of the appeal, on August 9, 2019, Plaintiff filed a motion requesting a briefing schedule for a proposed motion it wished to bring seeking certain contractually-mandated attorneys' fees. (Dkt. 97.) Defendants objected that the arbitrator, rather than this Court, should decide that issue. (Dkt. 99.) Whether the Court should decide the attorneys' fees issue is now fully briefed and ripe for decision. (Dkt. 153; Dkt. 156; Dkt. 161; Dkt. 163.)

On February 10, 2020, Plaintiff moved under Rule 25(a) of the Federal Rules of Civil Procedure to substitute Defendant Charles Mazza with the personal representatives or executors of his estate. (Dkt. 119 ¶ 21.) Plaintiff noted that, although Defendants' counsel failed to file a suggestion of death, they submitted documents to the NFA purporting to be signed by then-deceased Defendant Mazza. (*Id.* ¶ 18.) Defendants' counsel failed to appear at a hearing on that motion, and the Court entered an order to show cause "as to why defendants should not be sanctioned for misrepresentations or omissions about the death of [D]efendant Charles Mazza." (Dkt. 122.) Before the Court held a hearing on the show-cause order, the case was transferred to the undersigned judge. (Dkt. 125.) Rather than respond to the show-cause order or to Plaintiff's motion to substitute, Defendant Deborah Mazza, the

spouse of Defendant Mazza, filed her own motion to substitute. (Dkt. 127.) Plaintiff responded with a motion to reinstate the Court's show-cause order. (Dkt. 129.) Defendants filed their response on April 19, 2021. (Dkt. 169.) Those motions are now fully briefed. (Dkt. 142; Dkt. 154; Dkt. 169.)

In March 2020, the Seventh Circuit dismissed Defendants' appeal of the Arbitration Order for lack of jurisdiction. (Dkt. 135.) *See INTL FCStone Fin. Inc. v. Jacobson*, 950 F.3d 491 (7th Cir. 2020). Then, on June 5, 2020, Plaintiff filed a motion styled as a "Motion to Enforce" the Arbitration Order. (Dkt. 152.) Plaintiff complained that Defendants had, in violation of that order, "demanded and obtained from NFA final hearings and proceedings, including final evidentiary hearings, outside" the Northern District of Illinois. (*Id.* ¶ 2.) In response, Defendants filed a motion to stay this case, arguing that the venue decision (and the sanctions and show-cause decisions) should be made by the arbitrator in the first instance. (Dkt. 156.) The Court ordered simultaneous briefing on those cross-motions, which are now ripe for decision. (Dkt. 161; Dkt. 162; Dkt. 163; Dkt. 164.)

## II.  LEGAL STANDARD

**Plaintiff's Motion to Enforce**: District courts have "inherent limited authority to enforce compliance with court orders and ensure judicial proceedings are conducted in an orderly manner." *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 757 (7th Cir. 2008) (quoting *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001)). Yet styling a motion as one "to enforce" a previous order does not necessarily make it a motion to enforce. *See Blue Cross Blue Shield of Mass., Inc. v. BCS Ins. Co.*, 671 F.3d

635, 637 (7th Cir. 2011) (rejecting "artful pleading" where party "wanted to disrupt the arbitration, and help itself to an interlocutory appeal, so instead of calling the request what it was—a proposal that a federal judge order the panel in an ongoing arbitration to decide a particular issue in a specified way—the litigant captioned its motion" otherwise). A district court has broad discretion to decide whether a party has violated its order because "a court that issue[s] an order is in the best position to interpret it." *In re Consol. Indus.*, 360 F.3d 712, 716 (7th Cir. 2004).

**Defendants' Motion to Stay**: Under Section 3 of the Federal Arbitration Act, if a party brings a suit in federal court on any issue "referable to arbitration under an agreement in writing for such arbitration, the court in which suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

**Plaintiff's Motion for Show-Cause Order:** This Court previously questioned whether a motion to instate a rule to show cause is procedurally appropriate. *See Sommerfield v. City of Chi.*, 252 F.R.D. 407, 413 (N.D. Ill. 2008). Here, however, the Court *sua sponte* issued a rule to show cause, in accordance with common practice. *See, e.g., MAS Capital v. Biodelivery Scis. Int'l, Inc.*, 524 F.3d 831, 834 (7th Cir. 2008). Thus, the Court will consider whether to reinstate the show cause order as though it raised the issue at its own instance.

## III.    DISCUSSION

This case—or, more precisely, the motions pending before the Court—implicate basic principles concerning the role district courts ought to play during ongoing arbitrations. As the Supreme Court has explained, the Federal Arbitration Act ("FAA"), which governs this case, was enacted "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). To that end, the Supreme Court has held that "[c]ontracts to arbitrate are not to be avoided by allowing one party to ignore the contract and resort to the courts. Such a course could lead to prolonged litigation, one of the very risks the parties, by contracting for arbitration, sought to eliminate." *Universal Reinsurance Corp. v. Allstate Ins. Co.*, 16 F.3d 125, 128 (7th Cir. 1993) (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 7 (1984)); *see Metro. Life Ins. Co. v. O'Malley*, 392 F. Supp. 2d 1042, 1044 (N.D. Ill. 2005) ("The court is mindful that arbitration foregoes the costly expenses of litigation for a more economical method to solve legal disputes"). And the Seventh Circuit has similarly cautioned that "[j]udges must not intervene in pending arbitration to direct arbitrators to resolve an issue one way rather than another. . . . Review comes at the beginning or the end, but not in the middle." *Blue Cross Blue Shield of Mass.*, 671 F.3d at 638 (citing *Trustmark Ins. Co. v. John Hancock Life Ins. Co.,* 631 F.3d 869 (7th Cir. 2011)).

With these principles in mind, the Court turns to the issues presented for decision: (1) whether the Court previously decided the appropriate venue for arbitration and, if not, whether the Court must decide that issue; (2) whether the

Court or the arbitrator should determine if Plaintiff is entitled to recover fees; and (3) whether the Court should reinstate its February 19, 2020 show-cause order (Dkt. 129) regarding alleged malfeasance concerning the death of Defendant Mazza.

## A.    Venue

The parties agree that this Court has decided the proper forum for initiating arbitration: the NFA, which is headquartered in Chicago. What remains is whether this Court has instructed (or should now instruct) the NFA not to conduct any hearings outside of this judicial district. According to Plaintiff, the venue selection clause of the parties' agreement requires arbitration to occur in Chicago. (Dkt. 152 ¶¶ 10–12.) Defendants do not attack this interpretation directly; they merely assert that the arbitrator, not the Court, should interpret the venue provision of the contract in the first place. (Dkt. 156 at 11.)

Because Plaintiff's venue motion is styled as a "motion to enforce" the earlier Arbitration Order, the first question is whether the Court ordered that all hearings before the NFA must be conducted in this judicial district. If the answer to that question is "no," the next question is: should the Court issue an order to that effect now? Each question is addressed in turn.

### 1.    Did the Arbitration Order Decide Venue?

In short, the Court's earlier Arbitration Order did not answer the question of venue. No party briefed venue before Judge Lefkow issued the Arbitration Order, and the Arbitration Order itself does not mention the venue provision of the arbitration agreement. Indeed, the Arbitration Order does not even contain the words "venue" or

"Chicago." Perhaps that is why the Seventh Circuit observed that venue had not been determined. *INTL FCStone Fin. Inc.*, 950 F.3d at 498 ("unresolved issues related to [the] arbitration order . . . include arbitration venue")).

Plaintiff attempts to avoid that issue by contending that, because the Arbitration Order compelled the parties to arbitrate "pursuant to Section 4 of the FAA," this means "all the requirements of that Section, including the requirement to arbitrate within this judicial district, are explicitly incorporated into the Arbitration Order." (Dkt. 152 ¶¶ 26–27.) There is no question that Defendants initially complied with the order by submitting to arbitration before the Chicago-headquartered NFA. (Dkt. 156-3 at 1; Dkt. 156-4 at 2.) Plaintiff objects to what happened next: Defendants asked (and the NFA allowed) for hearings outside of Chicago, including outside of this district. (Dkt. 156-4; Dkt. 161 at 5.) Plaintiff says this violated Section 4 of the FAA as incorporated into the Arbitration Order because that section states that, when a court compels arbitration under Section 4, "[t]he hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4.

To grant Plaintiff's motion, then, the Court would have to find that Section 4 not only requires the correct district court to compel arbitration before the correct arbitrator, but also bars parties compelled to arbitration from asking the arbitrator to conduct hearings outside the judicial district of the court that compelled arbitration (and, for that matter, bars arbitrators from granting such requests).

In the Court's view, that is not the law. To be sure, Section 4 dictates which

court can issue an order compelling arbitration. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 329 (7th Cir. 1995) ("[W]here the arbitration agreement contains a forum selection clause, only the district court *in that forum* can issue a § 4 order compelling arbitration"). But once arbitration is compelled, judges "must not intervene in pending arbitration to direct arbitrators to resolve an issue one way rather than another." *C. States, S.E. and S.W. Areas Pension Fund v. U.S. Foods, Inc.*, 761 F.3d 687, 689 (7th Cir. 2014).

Defendants followed the Arbitration Order by submitting to arbitration before the NFA in this judicial district. (*See* Dkt. 156-4 at 2.) But the Arbitration Order did not bar Defendants from asking the NFA to hold some hearings outside of this District, and the NFA was not barred from granting their request. *See Vogel v. Vogel*, 2014 WL 12575815, at *2 & n.2 (C.D. Cal. June 23, 2014) (a district court "must compel arbitration in [its] district if it finds that th[e] action is subject to arbitration" under 9 U.S.C. § 4, but "the law does not appear to bar an arbitration body from transferring or dismissing a case after a district court has compelled the parties to arbitrate before it"); *cf. Collins v. Chi. Inv. Grp., LLC*, 2012 WL 938725, at *2 (D. Nev. Mar. 20, 2012) (declining to reverse arbitrator's decision to transfer case from Las Vegas to Chicago); *Legaspy v. Fin. Indus. Regulatory Auth., Inc.*, 2020 WL 4696818, at *2 (N.D. Ill. Aug. 13, 2020) (declining to reverse arbitrator's decision to conduct hearings remotely rather than in the venue specified by agreement).

Plaintiff contends that the Seventh Circuit has "found that Section 4 of the FAA is mandatory and requires that any arbitration hearing must take place within

the judicial district in which the court order compelling arbitration was entered."
(Dkt. 161 at 3–4 (citing *Lauer*, 49 F.3d at 327; *Faulkenberg v. CB Tax Fran. Sys., LP*,
637 F.3d 801, 808 (7th Cir. 2011); *Haber v. Biomet, Inc.*, 578 F.3d 553, 558 (7th Cir.
2009); *Snyder v. Smith*, 736 F.2d 409, 420 (7th Cir. 1984), *overruled on other grounds
by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)). Plaintiff overstates the holding
in these cases, each of which concerned the court's authority to make prearbitration
decisions, not the *arbitrator*'s authority to decide venue. Indeed, none of Plaintiff's
cited authorities discussed, or even mentioned, what type of venue decisions
arbitrators can make once a case is properly before them. *See Lauer*, 49 F.3d at 329
(Section 4 judicial district requirement is "a prescription for judicial economy that
entails channeling prearbitration litigation into the appropriate forum" and serves as
"a directive to courts to abstain from controlling intervention in arbitration
proceedings outside their district"); *Faulkenberg*, 637 F.3d at 808 ("Rule 12(b)(3)
motion to dismiss for improper venue, rather than a motion to stay or to compel
arbitration, is the proper procedure to use when the arbitration clause requires
arbitration outside the confines of the district court's district"); *Haber*, 578 F.3d at
558 (same); *Snyder*, 736 F.2d at 419–420 (purpose of Section 4 judicial district
requirement is to prevent "any party to an arbitration agreement [from] avoid[ing]
the effect of the agreed-to forum merely by filing suit in a different district" which
would result in parties "racing to different courthouses to obtain what each thinks is
the most convenient forum for it").

    *Snyder* best illustrates Plaintiff's misunderstanding of precedent. Plaintiff

relies on *Snyder* in stating that "Section 4 is the focal point for any robust analysis of the arbitrability issue as it relates to venue selection clauses" and asks the Court to "disregard" caselaw applying Section 2. (*See* Dkt. 164 at 12 (citing *Snyder*, 736 F. 2d at 418–420).)[4] But *Snyder* does not reach that far. In *Snyder*, the parties entered an arbitration agreement that specified the venue for arbitration as Houston, Texas. *Snyder*, 736 F.2d at 418–420. Snyder, the plaintiff, sued in the Northern District of Illinois, seeking an order compelling arbitration in that district. *Id*. Snyder then asked the court to disregard the venue-selection clause because "she filed suit in the Northern District of Illinois and that court could compel arbitration only in its own district." *Id*. at 419. But because Section 4 prohibited the district court from disregarding the venue selection clause, the Seventh Circuit concluded that the FAA required the district court to dismiss the matter for improper venue. *Id*. at 420. *Snyder* explained that to hold otherwise, could lead to the parties "racing to different courthouses to obtain what each thinks is the most convenient forum for it, in disregard of its contractual obligations." *Id*. at 419–20.

Contrary to Plaintiff's suggestion, therefore, *Snyder* (and *Lauer*, *Faulkenberg*, and *Haber*) did not: (1) involve an arbitrator's venue decision; (2) distinguish arbitrability under Section 2 from Section 4; or (3) discuss whether the interpretation of a venue selection clause is arbitrable. *See also Lauer*, 49 F.3d at 329; *Faulkenberg*,

---

[4] Plaintiff also relies on *Automobile Mech. Local 701 Welfare and Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740 (7th Cir. 2007). It is unclear how this case supports Plaintiff's position. There, the Seventh Circuit held that the district court improperly dismissed a suit for improper venue. *Id*. at 745–747. The Court held that, even though an arbitral venue selection clause specified another venue, the parties had waived the issue. *Id*. at 747.

637 F.3d at 808; *Haber*, 578 F.3d at 558. Moreover, Plaintiff's desired result would lead to forum shopping in which a party could render the interpretation of a venue-selection clause nonarbitrable by racing to the courthouse to obtain an order compelling arbitration under Section 4. That result would violate the reasoning of *Snyder*.

More fundamentally, Plaintiff's attempt to separate Section 2 of the FAA from Section 4 (Dkt. 152 ¶¶ 32–46) is not supported by the statutory text. The text offers no good reason to find venue arbitrable under Section 2 but nonarbitrable under Section 4. Section 2 sets forth the types of arbitration agreements that courts must enforce. 9 U.S.C. § 2 (written arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); *see Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1424 (2017) (Section 2 "requires courts to place arbitration agreements on equal footing with all other contracts") (cleaned up). It preempts state law in at least some circumstances. *See Southland v. Keating*, 465 U.S. 1, 6–10 (1984).

Section 4, on the other hand, applies only to federal courts and sets the procedures for compelling arbitration. *Id*. at 16 n.10. Section 2 and Section 4 thus work together: Section 2 defines the types of arbitration agreements that must be enforced in all circumstances (the "what"); Section 4 provides the manner for obtaining an order compelling arbitration from a federal court (the "how"). There is no suggestion in the statutory text that the scope of arbitrability should differ from section to section. In the absence of such language, the Court cannot stretch the

holdings in *Snyder*, *Lauer*, *Faulkenberg*, and *Haber* to mean that any order compelling arbitration under Section 4 renders interpretation of a venue-selection clause nonarbitrable.

In sum, the Arbitration Order compelled Defendants to submit to, and to begin, arbitration before the NFA in this District. Because this Court only had the power under Section 4 to compel arbitration in this District, the order was of no effect outside of this District. It does not follow, however, that the order prohibited the parties from requesting a change of venue from the *arbitrator*, nor does it follow that the order prohibited the arbitrator from granting such requests. Accordingly, the Arbitration Order did not decide the question of venue for the entirety of the arbitral proceeding.

### 2.    Should the Court Decide the Venue Question Now?

In the alternative, Plaintiff requests that the Court decide the venue issue now. Even if the order compelling arbitration left the venue question open, Plaintiff says, the venue selection clause in this case is unambiguous and the NFA has incorrectly interpreted it by allowing hearings to take place outside of Chicago. (*See* Dkt. 152 ¶¶ 10–12.)

"Where ordinary contracts are at issue, it is up to the parties to determine whether a particular matter is primarily for arbitrators or for courts to decide." *BG Grp., PLC v. Republic of Arg.*, 572 U.S. 25, 33 (2014). Neither party argues that the contract specifically dictates whether the venue-selection clause is arbitrable. Where, as here, a contract is silent as to whether the relevant question is arbitrable, courts

look to whether the question is "procedural" or "substantive." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84–85 (2002). If the question is procedural, the Court presumes it should be resolved by the arbitrator in the first instance. *Id.*; *see also Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452–53 (2003) (plurality opinion) ("The relevant question here is what *kind of arbitration proceeding* the parties agreed to. That question does not concern a state statute or judicial procedures. It concerns contract interpretation and arbitration procedures. Arbitrators are well situated to answer that question") (internal citation omitted).

Nearly every court applying the procedural/substantive distinction to the arbitrability of venue has determined that venue is a procedural issue that should be decided by the arbitrator in the first instance. *See*, *e.g.*, *Richard C. Young & Co. v. Leventhal*, 389 F.3d 1, 5 (1st Cir. 2004) ("Since the dispute between the parties is concededly arbitrable, determining the place of the arbitration is simply a procedural matter and hence for the arbitrator"); *UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 655 (2d Cir. 2011) ("[V]enue is a procedural issue that [the] arbitrators should address in the first instance"); *Bamberger Rosenheim, Ltd., (Israel) v. OA Dev., Inc., (United States)*, 862 F.3d 1284, 1288 (11th Cir. 2017) (same); *cf. Cent. W. Va. Energy, Inc. v. Bayer Cropscience LP*, 645 F.3d 267, 274 (4th Cir. 2011) (dispute over which arbitration panel should decide a particular issue was "far more akin to a venue dispute than a question of arbitrability, and, as such, it [was] appropriate for arbitral resolution"); *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1178 n.3 (10th Cir. 2007) ("[V]enue is a matter that goes to process rather than substantive rights—

14

determining which among various competent tribunals will decide the case") (cleaned up). That is true even if the arbitration agreement includes a venue-selection clause. *See LodgeWorks, L.P. v. C.F. Jordan Const., LLC*, 506 F. App'x 747, 750 (10th Cir. 2012) (despite venue selection clause, "[t]he district court erred in holding LodgeWorks was substantially likely to succeed on the merits of its claim that a court, not the arbitrators, would decide venue"); *McCullagh v. Dean Witter Reynolds, Inc.*, 177 F.3d 1307, 1310 (11th Cir. 1999) ("The arbitrators [will] presumably enforce the venue-selection clause in precisely the same way that a court would"); *cf. BG Grp.*, 572 U.S. at 35 ("The provision before us is of the . . . procedural[ ] variety. . . . It determines *when* the contractual duty to arbitrate arises, not *whether* there is a contractual duty to arbitrate at all").[5]

Plaintiff asks this Court to follow cases where courts applying Section 4 of the FAA took the venue decision away from the arbitrator. (Dkt. 161 at 9–10 (citing *Polimaster Ltd. v. RAE Systems, Inc.*, 623 F.3d 832, 841 (9th Cir. 2010); *Sterling Fin. Inv. Grp., Inc. v. Hammer*, 393 F.3d 1223 (11th Cir. 2004); *Linsco/Private Ledger Corp. v. Maurice*, 2007 WL 869720 (M.D. Tenn. March 21, 2007)). According to Plaintiff, those cases stand for the proposition that "whether a venue provision [i]s enforceable in accordance with the parties' written agreement [i]s a 'gateway dispute' to be decided by the court, not an issue for the arbitrator to decide." (*Id.* at 10.)

---

[5] Although courts usually leave interpretation of a venue-selection provision to the arbitrator, they will determine whether a venue-selection clause is unconscionable. *See, e.g., Jackson v. Payday Fin., LLC*, 764 F.3d 765, 778 (7th Cir. 2014) (choice of forum clause in arbitration agreement was "both procedurally and substantively unconscionable"). Neither party argues the venue-selection clause is unconscionable in this case.

As explained above, the Court disagrees that venue is nonarbitrable in any case brought under Section 4. Moreover, to the extent the *Polimaster*, *Sterling*, and *Maurice* courts held venue was nonarbitrable for other reasons, this Court respectfully declines to follow them for the reasons identified by the Eleventh Circuit in *Bamberger*. 862 F.3d at 1288.

In *Bamberger*, the Eleventh Circuit declined to follow the divided decision in *Polimaster* and announced that it would "hold, consistent with at least four other circuits, 'that disputes over the interpretation of forum selection clauses in arbitration agreements raise presumptively arbitrable procedural questions.' " *Id.* at 1288 (quoting *UBS Fin. Servs., Inc.*, 660 F.3d at 655); *see Bayer Cropscience LP*, 645 F.3d at 273–74; *Ridge at Red Hawk*, 493 F.3d at 1178 & n.3; *Leventhal*, 389 F.3d at 5; *see also McCullagh*, 177 F.3d at 1310 (declining to interpret venue selection clause in the first instance because "[t]he arbitrators [will] presumably enforce the venue-selection clause in precisely the same way that a court would"). *Bamberger* clarified that *Sterling* "does not stand for the proposition that arbitral venue is a question for the courts to resolve independently." *Bamberger Rosenheim, Ltd.,* 862 F.3d at 1288. And *Bamberger* asserted that *Polimaster* "failed to engage in any analysis as to whether arbitral venue is a question of arbitrability." *Id*. at 1289.

In the absence of a controlling precedent of the Seventh Circuit, *Bamberger*, *Bayer Cropscience*, *Ridge at Red Hawk*, and *Leventhal* are, to this Court, more persuasive than the *Sterling*, *Polimaster*, and *Maurice*. Accordingly, the Court holds that the interpretation of the parties' venue-selection clause is a procedural question

that should be decided in the first instance by the arbitrator.

### B.   Attorneys' Fees

In addition to venue, the parties dispute whether the Court should determine if Defendants are entitled to contractually-mandated attorneys' fees incurred in prosecuting this litigation. (*See* Dkt. 156 at 13–15; Dkt. 161 at 11–13.) The FAA does not provide for an award of attorneys' fees to prevailing parties. *See Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir. 1994). A party seeking attorneys' fees incurred bringing a motion to compel arbitration typically must show that such fees are: (1) authorized by some other statute; or (2) warranted because the opposing party sought to avoid arbitration in bad faith. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975); *see also United Food and Com. Workers, Union, Loc. 546, AFL-CIO v. Ebro Foods, Inc.*, 1992 WL 245541, at *1 (N.D. Ill. Sept. 21, 1992); *Mech. Power Conversion, L.L.C. v. Cobasys, L.L.C.*, 500 F. Supp. 2d 716, 721 (E.D. Mich. 2007). Plaintiff does not pursue either route. Instead, Plaintiff argues that the Court should determine whether Plaintiff is entitled to fees under the arbitration agreement for fees it incurred bringing this action. (Dkt. 161 at 11.)

Under the arbitration agreement, the parties must arbitrate "[a]ny controversy or claim arising out of or relating to [Defendants' investment] accounts." (Dkt. 161-3 at 23.) Defendants argue that, because the phrase "arising out of or relating to . . . accounts" is broad enough to include Plaintiff's claim for fees incurred during this action, the fee issue is arbitrable. (Dkt. 156 at 13–15.). Defendants rely on *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027 (7th Cir. 2012), in which the Seventh Circuit

held that a similar clause requiring arbitration of all claims "arising out of" an agreement "necessarily creates a presumption of arbitrability, which requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* 1034 (cleaned up).

Plaintiff admits that its attorney fee claim arises under the arbitration agreement. (*See* Dkt. 97 at ¶¶ 17–19.) But Plaintiff argues that *Gore* does not control because "*agreement*"—the term analyzed in *Gore*—is broader than "*account*"—the term in the contract here. (Dkt. 161 at 12.) (Emphasis added.) That attempt to distinguish *Gore* fails. In *Gore*, the Seventh Circuit held that "arising out of" in the context of an arbitration agreement "reaches all disputes having their origin or genesis in the [agreement], whether or not they implicate interpretation or performance of the [agreement] per se." *Gore*, 666 F.3d at 1033 (citing *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993)). Because "arising out of or relating to language [is] extremely broad and capable of an expansive reach," it "necessarily create[s] a presumption of arbitrability." *Id.* at 1034 (cleaned up) (quoting *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909, 910 (7th Cir. 1999)); *see also Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002) ("[W]e have naturally been willing to read these admittedly expansive clauses quite broadly to include all manner of claims tangentially related to the agreement, including claims of fraud, misrepresentation, and other torts"). In *Gore*, that meant the parties' tort claims and disputes arising out of related agreements without arbitration clauses fell under the umbrella of the arbitration agreement.

*Gore*, 666 F.3d at 1035–36.

*Gore* controls here. While the arbitration clause in *Gore* reached related agreements without arbitration clauses, Plaintiff's claim for fees arises under the same agreement that contains the arbitration clause. (*See* Dkt. 97 ¶¶ 17–19.) This means that the tangential disputes in *Gore*—which were arbitrable—were even farther from the core claims the parties agreed to arbitrate than Plaintiff's claim for contractual attorneys' fees in this case.

Plaintiff's reliance upon the distinction between "account" versus "agreement" is immaterial. Plaintiff and Defendants do not have any agreements unrelated to Defendants' accounts; and it is unlikely the parties agreed to arbitrate disputes arising out of some of their agreements but not others. *Compare Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 664 (7th Cir. 2002) (arbitration agreement applied to one contract but not another where the parties had "two . . . contracts [that] [we]re separate, and there [wa]s no indication that the parties intended that the terms of" one agreement should apply to the other) *with Gore*, 666 F.3d at 1035 (arbitration clause in one agreement applied to other, "interlinked" agreements). Indeed, the arbitration agreement did not create new substantive business relations between the parties; it merely created a process for resolving disputes arising out of the only business relationship they had. It would be unreasonable to find that the defendant-investors must have anticipated mandatory arbitration of their substantive account-related claims at the same time Plaintiff could pursue parallel, public litigation of claims relating to the arbitration agreement itself. *Cf. Trustmark*,

631 F.3d at 874 ("[T]he confidentiality agreement—a standard form in insurance arbitration, signed while the arbitration was under way—is closely related to the substance of the first arbitration and presumptively within the scope of the reinsurance contracts' comprehensive arbitration clauses, which cover all disputes arising out of the original dispute").

Even if there were doubt about the precise nature of the parties' business relationship, there is no question that the arbitration agreement's "arising out of" language creates a presumption of arbitrability. *See Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 54 (7th Cir. 1995). This presumption—the requirement that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"—means that the fees issue here must be decided by arbitration. *Moses H. Cone Meml. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

As a fallback, Plaintiff cites *Acosta v. Kerrigan*, 58 Cal. Rptr. 3d 865, 871 (Cal. Ct. App. 2007) and *Radiant Sys., Inc. v. Am. Scheduling, Inc.*, 2006 WL 2583266 (N.D. Tex. Sept. 7, 2006), both of which held that the court, not the arbitrator, should decide whether to award fees incurred seeking a court order compelling arbitration. *Acosta*, 58 Cal. Rptr. 3d at 871; *Radiant*, 2006 WL 2583266, at *2.[6]

Those cases fail to overcome *Gore*'s binding effect. In any event, *Acosta* and *Radiant* are contradicted by other nonbinding but persuasive authority.[7] *See, e.g., N.*

---

[6] Plaintiff also cites *Baggaley v. Wells Fargo Bank, N.A.*, 2018 WL 8804574, at *2 (C.D. Cal. 2018), but that opinion does not mention attorneys' fees.

[7] Defendants have not attempted to distinguish *Radiant* or *Acosta*, but neither case is persuasive here. In *Radiant*, unlike in this case, the arbitrator was the first to conclude that

*Cent. Const. v. Siouxland Energy & Livestock Co-op.*, 2004 WL 2413394, at *9 (N.D. Iowa Oct. 26, 2004) (party was required to seek contractually-mandated attorneys' fees from the arbitrator, not the court); *Yi Su v. T-Mobile USA, Inc.*, 2004 WL 1348740, at *2 (N.D. Tex. June 15, 2004) (arbitrator, not court, should decide whether party was entitled to contractually-mandated attorneys' fees incurred bringing motion to compel arbitration); *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir. 2003) (arbitrator should be first to determine whether attorney fee issue was arbitrable).

For these reasons, the Court holds that the arbitrator, not a federal court, should determine whether Plaintiff is entitled under the arbitration agreement to reimbursement of attorneys' fees incurred compelling Defendants to arbitrate in the proper forum.

## C.    Show-Cause Order

Having determined that the issues of venue and contractual attorneys' fees are for the arbitrator to decide, next up is whether sanctions are warranted in connection with the matter addressed in the show-cause order (Dkt. 129). As background, Plaintiff filed in February 2020 a motion to substitute relating one of the investor parties, Defendant Charles Mazza, based on Mazza's death in April 2019. (Dkt. 119.)

---

the court should decide the fee issue. *Radiant*, 2006 WL 2583266, at *2. As the arbitrator had already passed on the issue, *Radiant* did not meaningfully engage with that question. And in *Acosta*, a divided panel of the California Court of Appeal similarly sidestepped the contractual language and held, by "only the slimmest of margins" (and over a dissent), that the court should decide the fee issue as a matter of "practical policy." *Acosta*, 58 Cal. Rptr. 3d at 869–71. This Court is persuaded, however, that the authorities cited throughout this opinion control over perceptions of policy—practical or otherwise.

Plaintiff alleged that Defendants' counsel, John Chapman, knew of Mazza's passing no later than November 2019, yet Defendants failed to report his death to this Court and submitted documents in arbitration that falsely purported to be signed by him. (*Id.*)

Defendants' counsel failed to appear at a hearing on the motion and, on February 19, 2020, Judge Lefkow entered an order "to show cause . . . as to why defendants should not be sanctioned for misrepresentations or omissions about the death of defendant Charles Mazza." (Dkt. 122.) The Court then set a show-cause hearing for February 26, 2020, but that hearing was continued when the matter was transferred from Judge Lefkow to the undersigned judge. (Dkt. 126.) Plaintiff now asks the Court to revisit the issue (Dkt. 161 at 13–15). In contrast, Defendants assert that "[t]he delayed disclosure of Dr. Mazza's death had no impact whatsoever on any court or arbitral proceeding—it simply created another opportunity for [Plaintiff] to extend and multiply these legal proceedings." (Dkt. 156 at 15.)

Rule 11 of the Federal Rules of Civil Procedure requires that "when an attorney or party files papers with the court, they certify that to the best of their knowledge, information, or belief, formed after an inquiry reasonable under the circumstances, that the claims or legal contentions set forth are warranted by law and the factual contentions in the papers have evidentiary support." *Momo Enters.*, *LLC v. Banco Popular of N. Am.*, 2017 WL 4357390, at *1 (N.D. Ill. Sep. 30, 2017), *aff'd* 738 F. App'x 886 (7th Cir. 2018). Rule 11 imposes "an affirmative duty of reasonable investigation by an attorney 'signing, filing, submitting, or later advocating' any court document."

*Capuano v. Consolidated Graphics, Inc.*, 2007 WL 2088682, at *2 (N.D. Ill. July 20, 2007).

In its discretion, the Court declines to impose sanctions on Chapman despite his having failed timely to report Mazza's death and his role in presenting arguably misleading filings. But the issue is close. In opposing sanctions, counsel contends, citing a case from the Northern District of Texas, that "sanctions may not be imposed for mere negligence on the part of counsel." *Barrett v. Medicredit, Inc.*, 2019 WL 1327072, at *6 (N.D. Tex. 2019). That might be true—but counsel's months-long failure to ascertain the death of his client, followed by the failure to alert opposing counsel of that death immediately afterward, can be described as "mere negligence" only under the most charitable construction of these facts. *Id*. Although the Court declines to impose a sanction, counsel is cautioned that any additional instances of similar conduct will be subject to progressive discipline.

## IV.   CONCLUSION

For the reasons stated above, the Court rules as follows: (1) Plaintiff's motions to enforce the Court's previous order (Dkt. 152; Dkt. 175) are denied; (2) Plaintiff's motion for contractually-mandated sanctions is denied; and (3) Defendants' motion to stay (Dkt. 156) is granted.

SO ORDERED in No. 19-cv-01438.

Date: September 30, 2021

_____
JOHN F. KNESS
United States District Judge